### STATE OF NORTH CAROLINA v. R. H. McLAWHORN.

(Filed 20 June, 1967.)

**1. Homicide § 20—**

Testimony of two witnesses for the State that they saw defendant fire a pistol and that immediately thereafter deceased fell. mortally wounded, exclaiming that he had been hit, is clearly sufficient to make out a case for the jury.

**2. Criminal Law § 84—**

It is competent for the State to introduce testimony that its witness had previously made substantially the same statement as he had given in his testimony at the trial for the purpose of corroborating the witness. The fact that the statement made to corroborate the witness was not made in the presence of defendant and that the witness had not first testified that he had talked with the corroborating witness is immaterial.

**3. Homicide § 27— Defendant's evidence held not to raise questions of provocation or self-defense.**

The State's evidence tended to show a fight between a sailor and five Marines at the entrance to a motel, that defendant, in charge of running the motel, told the combatants to "break it up," that four of the Marines were pulling the fifth Marine away and had gotten to the gate, when the fifth Marine broke away and started back, that defendant was seen to fire a pistol, and immediately thereafter the fifth Marine claimed he had been hit. Defendant's testimony was that he did not fire the shot which caused the death. *Held:* The State's evidence does not raise the questions of legal provocation or self-defense, and therefore it was not error for the court to fail to charge upon either of these matters.

**4. Same—**

Where the State's evidence tends to show that defendant intentionally shot deceased with a deadly weapon, inflicting mortal injury, and defendant depends solely on his contention that he did not fire the shot which caused the death, the question of an accidental killing is not presented, and the court did not commit error in failing to charge upon defendant's contention of an accidental killing, the court having charged the jury that the burden was on the State to prove that defendant intentionally shot deceased in order to sustain conviction.

**5. Homicide § 7—**

The evidence tended to show that the proprietor of a motel ordered five Marines to leave the premises after a fight with a sailor, that, pursuant to the order, four of the Marines had pulled the fifth Marine to the gate when the fifth Marine broke away and started back, unarmed, that the proprietor of the motel shot him after he had gone three or four feet, notwithstanding there was no reason to believe his companions would not be able to control him. *Held:* The evidence does not raise the question of provocation sufficient to warrant the proprietor in slaying the trespasser.

**6. Homicide § 10—**

The right to kill in defense of another cannot exceed such other's right to kill in his own defense, including the requirement of reasonable apprehension of death or great bodily harm.

**7. Criminal Law § 107—**

Where none of defendant's evidence located him at a place from which it would have been impossible for him to have committed the crime, the evidence does not raise the question of alibi, and it is not error for the court to fail to charge thereon.

APPEAL by defendant from *Peel, J.,* 31 October 1966 Session of LENOIR.

Defendant, indicted for murder in the first degree for killing Harry H. Brown on 26 August 1966, was tried for murder in the second degree by a jury selected from a panel summoned from Wayne County.

The evidence for the State tended to establish these facts: About midnight on 26 August 1966, five Marines from Camp Lejeune (Freeman, Quinlivan, Kolonick, Brown, and Compton), each of whom had previously consumed five or six cans of beer, went to the Cadillac Motel, located on Highway 70 outside of Kinston. "Three boys went in the back"; the other two remained in the front office and talked with Mr. Griffin, the clerk. After thirty minutes the three rejoined the two in the office, and all decided to leave. As they walked toward their car, a sailor (Ronald K. Richards) and his girl drove up. The sailor went into the office, leaving the girl in the car. The Marines immediately walked to the car and one of them said to the girl, "Give me a kiss, honey." The sailor came out of the office, and they turned to go, "laughing because of the sailor and girl being there." When the sailor demanded to know why they were laughing, the five started toward him. He reached into the car, got an unloaded pistol, and pointed it at them. This maneuver stopped the Marines in their tracks for 15-20 seconds, but, when the sailor did nothing with the pistol, one of them made the statement that it was not loaded. The five started at him again. As they came at him, the sailor tossed the pistol to the front seat of his car, beside the girl. Brown, the Marine who was later shot, reached him first. The sailor struck Brown, and a wrestling match ensued with the other four Marines "in a bunch around Brown and the sailor." Griffin and defendant McLawhorn rushed out of the office, and Griffin yelled, "Break it up." Brown's companions then tried to pull him away from the sailor. When he resisted their efforts, defendant went back into the motel and came out with a small, shiny revolver. When the Marines saw the pistol, they "really started pulling on Brown to go back." Five to ten seconds later, they had gotten Brown about 40 feet from the sailor's car and were pushing him out of the entrance gate, when he got away from them — three or four feet. They heard a small "crack" and saw Brown double up, clutching his abdomen. He said he was hit. At that time, defendant ran around the building. As the Marines examined Brown for a wound, defendant came up, and one said to him, "You shot my buddy." Defendant's reply was, "If I wanted to shoot him, I would." His companions then took Brown to the Naval Hospital at Lejeune. A small caliber bullet, which had entered his body on the left side and had traveled "cross-wise and up," was removed from the opposite side of his abdomen. He died within 24 hours as a result of the bullet wound.

Three of the Marines testified. Two, Freeman and Quinlivan, said that they did not see the shot fired. The third, Kolonick, testified: "I was looking at McLawhorn when I heard the crack. I saw the pistol in his hand at that time. That is where the shot came from." The fourth, Compton, had he been present at the trial, would have testified that he could not see who did the shooting.

Defendant testified that he did not shoot Brown. He said he was standing in the door of the motel when the Marines pushed the sailor over the hood of his car. He saw the sailor get loose and get his gun out and point it at the Marines. When he heard him pull the lever back, he stepped out of the door into the yard and told them that if they did not break it up and leave, he would call the sheriff or the military police. He said, "(S)o I turned around to go back in the office and was going to the phone . . . up in the front of the house, and before I could get up there, I heard . . . a shot. Well, I had just stepped out of the office and started to the front of the house to use the phone." On cross-examination, he said, "I was in the office when the shooting happened. I missed seeing the shooting." Defendant's testimony further tended to show: He did not own a pistol, and no one at the motel owned one. It is about 60 feet from the office of the motel to the driveway. Griffin left the motel the day that defendant was pointed out as the one who had done the shooting, and defendant has not been able to find him since. On cross-examination, defendant admitted that he had been convicted of "narcotics," aiding and abetting in breaking and entering, speeding, and forgery.

Defendant called the sailor, Richards, as an adverse witness. On direct examination, he testified that, on the morning after the shooting, he had told the deputy sheriff and military police that defendant was not the one with the gun; that it was Griffin who shot Brown. On cross-examination by the solicitor, his testimony tended to show: At the time he made the statement that Griffin had done the shooting, he himself was accused of it, because "they" thought a larger caliber bullet had entered Brown than the one which was removed, and he didn't care whom he accused. His pistol, which had been taken from him, had not been loaded. All his bullets were in the trunk of the car. He was angry with Brown, because he thought he was the one who had tried to get into the car with his fiancee, and he struck Brown, who never struck him. It was Griffin who had attempted to break up the fight between him and the Marines. It was after he had put his pistol back into his automobile that defendant came out of the motel with a pistol and said to the Marines: "He may not have enough nerve to shoot you, but I do." Defendant then told them to leave the premises. They had gone about

60 feet with Brown when he advanced in front of him (Richards), and defendant fired the shot. Defendant then went to the rear of the Richards car and somebody said, "You shot me." Defendant's reply was, "If I had wanted to shoot you, I would have aimed at you." Griffin then said, "Everything is O. K.; that was just a blank; pull your car over here." Richards then went into the motel for the night. He has since married the girl who was with him.

Deputy Sheriff Dawson testified that Richards had told him Griffin had done the shooting and that Freeman said defendant was not the one who fired the shot.

From a conviction of murder in the second degree and a sentence of imprisonment for not less than 15 nor more than 18 years, defendant appealed.

*T. W. Bruton, Attorney General; Ralph Moody, Deputy Attorney General, for the State.*
*C. E. Gerrans for defendant.*

SHARP, J. The evidence reveals that only one shot was fired at the time deceased received the bullet wound which caused his death. The State, having adduced testimony from two witnesses that they saw defendant fire a pistol and that immediately thereafter Brown fell, exclaiming that he had been hit, clearly made out a case for the jury. *State v. Smith,* 268 N.C. 659, 151 S.E. 2d 596; *State v. Downey,* 253 N.C. 348, 117 S.E. 2d 39; *State v. Brooks,* 228 N.C. 68, 44 S.E. 2d 482. Defendant's assignment of error based upon the denial of his motion for nonsuit is overruled.

Over defendant's objection, and for the purpose of corroborating the witnesses Kolonick, Freeman, and Quinlivan, the court permitted the last witness for the State, a Marine sergeant with the Criminal Investigation Department, to testify that Kolonick told him on the morning after the shooting that he had seen defendant fire the gun, and that the other two said they had seen defendant with it in his hand. Defendant assigns the admission of these statements as error, for that (1) they were not made in defendant's presence, and (2) the three witnesses had not first testified that they had spoken with the witness Bennett. This assignment of error is overruled upon the authority of *State v. Brown,* 249 N.C. 271, 106 S.E. 2d 232, wherein Winborne, C.J., said: "(I)t is competent to corroborate a witness by showing that he has previously made the same statement as to the transaction as that given by him in his testimony, and that it is not necessary to ask the witness to whom such former state-

ment, offered in corroboration, was made." *Id.* at 274, 106 S.E. 2d at 235.

The court charged the jury that if the State had satisfied them beyond a reasonable doubt from the evidence that defendant had intentionally shot Brown with a pistol, thereby inflicting a wound which caused his death, the presumption would arise that the killing was unlawful and that it was done with malice, and that the burden then devolved upon defendant to satisfy the jury "of such facts and circumstances, that is, the legal provocation that will rob the crime of malice and thus reduce it to manslaughter." *State v. Mangum,* 245 N.C. 323, 96 S.E. 2d 39; *State v. Utley,* 223 N.C. 39, 25 S.E. 2d 195.

The judge thereafter gave the following contentions in behalf of defendant: (1) that defendant did not fire the shot which caused Brown's death; and (2) that if the jury should find that he did fire the shot, the shooting was without malice because he fired at a trespasser who had been ordered to leave but showed "signs that he was not leaving." In giving the final mandate, the court instructed the jury that if they found beyond a reasonable doubt that defendant intentionally shot Brown with a pistol and inflicted a wound which caused his death, nothing else appearing, defendant would be guilty of murder in the second degree, and that would be their verdict unless defendant had shown to their satisfaction "that he was not acting with malice but *upon legal provocation, as the court has defined that term to mean to you.*" (Emphasis added.) If defendant had carried his burden, the jurors were instructed to acquit him of murder in the second degree and to consider whether he was guilty of manslaughter.

At no time in his charge did the judge define legal provocation. Defendant assigns this omission and the failure of the court to tell the jury what were the "facts and circumstances, that is, the legal provocation arising on the evidence, that would reduce the crime from second degree murder to manslaughter or that would excuse it altogether." He further assigns as error the failure of the court to charge upon accident, self-defense, and alibi.

Defendant offered no evidence of legal provocation, self-defense, or accident. His defense was that he did not fire the shot which caused Brown's death; that at the time of the shooting he had just stepped out of the office and started to the front of the house to use the phone *or* that he was in the office 40-60 feet away from the group in the yard. (He testified both ways.) Therefore, if any testimony required the trial judge to charge upon the legal provocation which would rebut the presumption of malice arising from an intentional

killing with a deadly weapon, it must be found in the State's evidence. A defendant is entitled to whatever advantage the State's evidence may afford him. *State v. Downey, supra; State v. Crisp,* 244 N.C. 407, 94 S.E. 2d 402.

The State's evidence contains no suggestion that defendant shot Brown accidentally. There is evidence that immediately after the shot was fired *Griffin* said, "Everything is O. K., that was just a blank." There was, however, no evidence that a pistol loaded with blanks was kept in the motel office for the purpose of frightening away trespassers. Nor was there any suggestion in the testimony that *defendant* thought the pistol contained blanks instead of live ammunition. Indeed, defendant testified that there was *no* pistol at the motel. The sailor, he said, could have shot Brown. The court did not err in failing to charge that defendant contended the killing was accidental. A defendant's assertion of accident is, of course, not an affirmative defense but merely a denial that he has committed an intentional killing. *State v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337. In this case, the court instructed the jury explicitly that, in order to convict defendant, the State was required to prove that he had *intentionally* shot Brown.

If one kills another with a deadly weapon by reason of provocation "such as would naturally and reasonably arouse the passions of an ordinary man beyond his power of control," this sudden passion will rebut the presumption of malice, 26 Am. Jur., Homicide § 22 (1940), and reduce murder in the second degree to manslaughter. *State v. Watson,* 222 N.C. 672, 24 S.E. 2d 540; *State v. Merrick,* 172 N.C. 870, 90 S.E. 257; *State v. Merrick,* 171 N.C. 788, 88 S.E. 501.

There was, however, no testimony offered by the State tending to show that defendant shot Brown in a sudden heat of passion caused by provocation which would cause an ordinary man to act so rashly on impulse and without due reflection. Neither Brown nor anyone else had made an assault upon defendant. *State v. Hightower,* 226 N.C. 62, 36 S.E. 2d 649; *State v. Mosley,* 213 N.C. 304, 195 S.E. 830. Not one of the Marines had attempted to invade the motel; so no question arises as to his right to defend his habitation or place of business. *State v. Miller,* 267 N.C. 409, 148 S.E. 2d 279. Four of the Marines were attempting to leave the motel premises with the fifth, as defendant had ordered them to do. We may assume that defendant became incensed because Brown was resisting his companions in their effort to take him out of the motel yard; still, under the circumstances here disclosed, the law does not deem Brown's trespass provocation sufficient to cause a man of ordinary firmness and aver-

age disposition to shoot him in a transport of passion he was unable to control.

> "A mere trespass or entry upon one's premises other than his dwelling, not amounting to a felony, is not considered sufficient provocation to warrant the owner's using a deadly weapon in its defense, or sufficient provocation to arouse the degree of passion requisite to reduce from murder to manslaughter his crime in slaying the intruder, notwithstanding the killing may have been necessary to prevent the trespass." 26 Am. Jur., Homicide § 27 (1940); see *State v. Morgan,* 25 N.C. 186.

If defendant intentionally shot Brown and caused his death, he could excuse the homicide altogether and secure his acquittal only by satisfying the jury that he lawfully killed him in self-defense. *State v. Fowler,* 250 N.C. 595, 108 S.E. 2d 892.

Undoubtedly, the proprietor of an inn, motel, or similar establishment has a right to repel an unprovoked assault upon one of his guests, provided he uses no more force than is reasonably necessary to protect the guest. "He could not kill the assailant of his patron merely because the patron had been assaulted." *Steele v. State,* 194 Ark. 497, 108 S.W. 2d 474. Moreover, one may lawfully do in another's defense only what the other might lawfully do in his own defense. *State v. Ritter,* 239 N.C. 89, 79 S.E. 2d 164; *State v. Cox,* 153 N.C. 638, 69 S.E. 419. In this case it was the sailor who, by his own admission, started the fight. Conceding that he had cause to be angry, he nonetheless voluntarily, that is, aggressively, willingly, and without legal provocation, entered into a fight with Brown. The sailor, therefore, could not have invoked the doctrine of self-defense without first withdrawing from the fight and giving notice to his adversary that he had done so. *State v. Church,* 229 N.C. 718, 51 S.E. 2d 345; *State v. Davis,* 225 N.C. 117, 33 S.E. 2d 623. However, were we to concede, *arguendo,* that defendant had the right to interfere in the fight on the side of the sailor, Brown's four companions were doing their best to withdraw Brown from the fight and to leave the premises. The evidence discloses no reason to believe that they and the sailor could not have controlled the resisting Brown. Furthermore, the sailor had discarded his unloaded pistol, and none of the Marines had displayed any deadly weapon. The State's evidence, therefore, discloses no circumstances which might reasonably have caused defendant to believe that it was necessary for him to shoot Brown to save the sailor or anybody else from death or great bodily harm. Nor does it disclose that defendant gave Brown or the others any warning of his intention to shoot if they did not leave.

In the instant transcript, there is no evidence either of self-defense or of legal provocation which would rebut the presumption of malice if the jury found that defendant intentionally shot Brown and thereby caused his death. Thus, the court's failure to define legal provocation was not error. The court's reference to legal provocation and the statement of contentions in defendant's behalf with reference thereto was favorable rather than prejudicial to him. The judge would have been correct had he told the jury that if they were satisfied beyond a reasonable doubt that defendant intentionally fired the shot which caused Brown's death, "the entire evidence disclosed no mitigating, excusing, or justifying circumstances" which would reduce the homicide from murder in the second degree to manslaughter, or which would excuse it altogether upon the ground of self-defense. *State v. Gregory,* 203 N.C. 528, 166 S.E. 387.

Upon this record, if defendant fired the shot which killed Brown, he is guilty of murder in the second degree. If he is not the man who pulled the trigger, he is not guilty of any crime. The judge, in his charge, told the jury quite plainly that "defendant contends throughout that he did not shoot the pistol at all." He also charged them that if the State failed to satisfy them beyond a reasonable doubt that defendant intentionally killed deceased with a deadly weapon, it would be their duty to return a verdict of not guilty. Defendant was on the premises at the time Brown was shot and, by his own testimony, not over 60 feet from him at the time. If he was in the motel office, he could have fired the shot from the door — he said he was standing in the door when he saw the fight begin — and there is not the slightest evidence to negate the possibility that he could have fired the shot if he "had just stepped out of the office and started to the front of the house to use the phone." Defendant's contention that the judge erred in failing to charge on alibi is, therefore, also without merit. To entitle a defendant to a charge on alibi there must be evidence that at the time the crime was committed he was at a particular place which would make it *impossible for him* to have committed the crime. *State v. Green,* 268 N.C. 690, 151 S.E. 2d 606. Defendant was present in the immediate area when Brown was felled by a shot. The only question in the case was whether he was the man who fired the pistol. He said he was not the man. Other witnesses said he was. The jury resolved the issue of fact against defendant, and in the trial we find

No error.