STATE OF NORTH CAROLINA v. MARK ASHTON DEANS

No. 8410SC109

(Filed 6 November 1984)

1. **Homicide § 26— second degree murder — self-defense — evidence insufficient to dismiss charge**

    In a prosecution for second degree murder, there was no error in the denial of defendant's motion to dismiss the second degree murder charge and instruct only on voluntary manslaughter, based on imperfect self-defense, where the evidence, taken in the light most favorable to the State, led to a reasonable inference that defendant held the victim at gunpoint outside a trailer, forced the victim into the trailer at gunpoint, and shot the victim while the victim was defending himself from an attack by defendant.

2. **Homicide § 21.8— perfect self-defense — evidence insufficient**

    Defendant's evidence of perfect self-defense, taken as true, showed that the victim returned to a trailer after demanding that defendant leave the premises and that defendant followed with a gun knowing the volatile circumstances. He therefore "aggressively and willingly entered into the fight" and perfect self-defense was not established as a matter of law.

APPEAL by defendant from *Preston, Edwin S., Judge.* Judgment entered 10 October 1983 in WAKE County Superior Court. Heard in the Court of Appeals 27 September 1984.

Defendant was tried by jury and found guilty of second degree murder in the shooting of Joseph Willie Hales. The state offered evidence which tended to show that on 4 April 1983 Lonnie Sloan and his wife, Teresa, were driving on Highway 70 in Wake County. Lonnie Sloan drove past Hales Auto Sales at approximately five miles per hour when he saw defendant, standing beside his truck, pointing a gun at Hales, who was standing some three feet from the office trailer and facing defendant. Sloan did not see anything in Hales' hand. Hales was backing toward the trailer.

Sloan turned onto Mechanical Boulevard and again saw defendant pointing a gun at Hales who continued to back toward the office. Sloan proceeded on Mechanical Boulevard, turned around, and returned to Hales Auto Sales approximately two minutes after last seeing defendant and Hales in the lot. Sloan saw defendant walking from the trailer to defendant's truck and saw him hand a gun to a female sitting in the truck. Defendant had blood

on the left side of his head. Sloan went to a nearby telephone and called the police.

Patrolman Larry Garris, Garner Police Department, was sent to the scene in response to Sloan's report. He saw defendant's truck leaving Hales Auto Sales and stopped it. Patrolman Garris described defendant as bleeding profusely from head wounds and covered with blood to his feet. Defendant told Garris that a man, indicating someone at Hales Auto, had hit him with a hammer, but he did not tell Garris that he had shot anyone. Garris left defendant with Patrolman J. W. Pearce, who had independently arrived, and went to Hales' office. He found Hales lying on his right side between two wood stoves. Garris detected no pulse.

Patrolman Pearce returned to Hales Auto with defendant and his companion Sheila Franklin. He entered the office, inspected Hales, and thought he detected a pulse. Defendant was questioned, responding that Hales had hit him with a hammer and that he had shot him. Pearce recovered defendant's fully cocked gun from his truck.

Officer Albert Isley, Jr., a City-County Bureau of Identification crime scene specialist, performed a thorough premises search. He found a .22 caliber pistol near Hales' right hand. The magazine was loaded. No bullet was in the firing chamber and the gun's hammer was in a "safe cocked" position, rendering the gun incapable of firing.

A hammer was found at the left foot of the victim. Defendant's gun holster was underneath Hales' feet. A bullet fragment from defendant's gun was found at the rear of the trailer behind the office counter. On the counter, a telephone book was found opened to a page containing a listing for the Garner Police Department.

The trailer was spotted with a substantial amount of blood on the floor in the area of the deceased, the floor toward the door, and the porch. All of the blood was defendant's.

Outside the trailer, Isley found a bullet casing on the ground next to the office porch. Testing by the State Bureau of Investigation [hereinafter SBI] determined that the bullet fragment and shell casing came from defendant's gun. Defendant's gun automat-

ically ejected an expended round to the right and slightly backwards. In Isley's opinion the gun was fired from the area of the door but it was impossible to have fired the weapon from inside the trailer and have the casing land on the ground outside the trailer. On recross examination, Isley admitted that the gun could have been fired anywhere from two feet inside the trailer to the porch. On redirect examination, Isley's opinion was that the gun was fired from the porch area and not inside the door.

The SBI also conducted powder burn tests on the deceased's vest through which the fatal shot entered. Deceased's vest had no powder residue. Powder residue would not have been present if the gun was fired five feet or more from its target.

Dr. Dawson Scarboro, a pathologist and certified as an expert witness, stated that the victim died from one gunshot wound that entered below the left armpit, severing the aorta, and exiting near the right armpit. The victim also had contusions and scratches on the left ear; contusion, scratches and a cut on the left of his lip; bruises on the forehead; and abrasions over the knuckles of the right hand.

Defendant had four lacerations on the head. They ranged from approximately one-half inch to slightly over one inch, but no concussion or fracture was present. One cut was on the top of the head, one on the left side, and two on the back of the head.

Defendant offered evidence which tended to show that he and Sheila Franklin were returning from a vacation weekend at the beach when they passed Hales Auto. He had consumed approximately one-half bottle of wine before leaving the beach. He saw a portable camper on Hales' lot, and he decided to stop. Defendant had never transacted business at Hales'.

Defendant and Franklin looked at a camper and Hales demonstrated it to defendant. Hales and defendant unsuccessfully negotiated for a purchase price, defendant stating he could buy a comparable camper at a competitor's for less. Hales became verbally abusive and ordered defendant to leave.

Defendant and Franklin returned to defendant's truck and began backing up to leave. Hales went to the office trailer and returned. Franklin saw Hales throw a coffeepot into defendant's

windshield. Defendant parked the truck and exited. Hales approached from the rear of the truck, gun in his hand, ordering defendant to leave or be hurt. Defendant obtained his holstered gun from inside the truck, removed it, loaded the firing chamber and asked Hales to call the police. Defendant denied pointing his gun at Hales, but Franklin testified that both men pointed at each other. Hales lowered his gun to his side.

Defendant demanded that Hales call the police or pay for his windshield. Defendant retrieved the coffeepot, put it into the truck, and followed Hales into the office. Hales, standing behind a work counter, had the telephone receiver in his right hand and the gun in his left. Hales put the phone down and told defendant he would not call the police and to leave the premises. Defendant repeated his request that Hales call the police. Franklin stepped onto the porch near the door and pleaded with defendant to leave and get the police. Defendant turned to look at Franklin. Hales picked up a hammer. Franklin ran back to defendant's truck and as defendant turned toward Hales, Hales struck defendant on the left side of the head knocking defendant to the floor. Hales repeatedly struck defendant with the hammer as defendant got to his feet and tried to flee out the door.

As defendant started toward the door, Hales hit him in the back of the head again knocking defendant to the floor. Hales, kicking defendant and yelling that he was going to kill him, hit defendant twice more with the hammer. Defendant, on his knees just inside the door, fired one shot to repel the attack.

Defendant stumbled to his truck, put the gun on the dashboard, and Franklin assisted him into the truck. Franklin was driving the truck to the Garner Police Department when stopped by Patrolman Garris.

The Garner Rescue Squad transported defendant to the hospital. In route, defendant told rescue personnel that Hales had gone into a rage.

Defendant offered several witnesses who had previous business dealings with Hales. On several independent occasions, Hales demonstrated a violent disposition and conduct in the course of business transactions.

At the close of all the evidence, defendant moved, and the trial court denied, dismissal of the charge.

*Attorney General Rufus L. Edmisten, by Associate Attorney General Michael Smith, for the State.*

*DeMent, Askew & Gaskins, by Johnny S. Gaskins, for defendant.*

WELLS, Judge.

Defendant's single assignment of error is that the trial court erred in denying his motion to dismiss the charge of second degree murder at the close of all evidence. He argues that the evidence established, as a matter of law, perfect self-defense. We disagree and find no error.

The standards of appellate review for a denial of a motion to dismiss are well established. They are:

> [W]hether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If substantial evidence of both of the above has been presented at trial, the motion is properly denied. . . . [T]he evidence must be considered in the light most favorable to the State and the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom. . . . Contradictions and discrepancies in the evidence are strictly for the jury to decide. . . .

*State v. Lowery*, 309 N.C. 763, 309 S.E. 2d 232 (1983) (citations omitted). Our supreme court has consistently held that "the court must consider the defendant's evidence which explains or clarifies that offered by the State. . . . The court must also consider the defendant's evidence which rebuts the inference of guilt when it is not inconsistent with the State's evidence. . . ." *State v. Bates*, 309 N.C. 528, 308 S.E. 2d 258 (1983) (citations omitted).

[1]　Applying these principles to this case, we find substantial evidence of each essential element of second degree murder. Murder in the second degree is defined as "the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978)

(quoting *State v. Wrenn*, 279 N.C. 676, 185 S.E. 2d 129 (1971) (citations omitted) ). While defendant has raised the issue of perfect self-defense only, we have carefully considered the closer question of whether or not the trial court should have instructed the jury only on voluntary manslaughter based on imperfect self-defense. Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. *State v. Wilkerson, supra.*

When an individual intentionally takes the life of another with a deadly weapon, two presumptions arise: (1) unlawfulness and (2) malice. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203, *cert. denied*, 459 U.S. 1056 (1982). *See State v. Kirkley*, 308 N.C. 196, 302 S.E. 2d 144 (1983). If, as in this case, "there is evidence . . . of all the elements of self-defense, the mandatory presumption of unlawfulness disappears but the logical inferences from the facts proved may be weighed against this evidence." *State v. Hankerson*, 288 N.C. 632, 220 S.E. 2d 575 (1975), *rev'd on other grounds*, 432 U.S. 233 (1977). In sum, the State maintained the burden of producing evidence that defendant killed Hales under circumstances not amounting to perfect or imperfect self-defense.

In the light most favorable to the State, evidence was produced that after Hales threw a coffeepot into defendant's windshield defendant assaulted Hales with a gun. Lonnie Sloan's testimony, albeit contradictory to that of defendant and especially that of Franklin, permits the finding that Hales was unarmed and the inference that defendant forced Hales into the trailer office at gunpoint. Uncontradicted testimony established that inside the trailer, Hales was using the telephone while defendant watched, and the inference that he was calling the Garner Police Department as demanded by defendant. Circumstantial physical evidence established that Hales, at some point, obtained a gun. Defendant's testimony that Hales had a gun in his left hand while using the telephone explains its presence and must be considered. Franklin's testimony that Hales picked up a hammer when she came to the door and started to come from behind the counter, confirmed by the physical evidence, must also be considered.

Defendant's version of the altercation is that Hales attacked him with the hammer, defendant attempted to flee, and defendant was forced to shoot Hales from inside the trailer to defend him-

self. Physical evidence found at the scene clearly contradicts defendant's version of the shooting. The shell casing from defendant's gun was found outside the trailer. Isley's expert opinion was that the fatal shot came from outside the trailer door. Hales' vest had no powder burns on it. Scientific testing of defendant's gun permits the inference that the gun's muzzle was five feet or more from Hales' body when the fatal shot was fired. This inference contradicts defendant's testimony that he shot Hales while the latter was beating him with the hammer to "get [Hales] off of me. I was on my hands and knees and trying to get off the floor, and he was trying to beat me back onto the floor again. That is when I pulled the trigger."

Furthermore, Hales' physical condition indicates that defendant had struck him prior to the fatal shot. The record before us is devoid of any testimony by defendant of a fight between the two men. Yet, Dr. Scarboro found scratches on the deceased's left ear; contusion, scratches, and a cut on the lip; two apparent bruises on the forehead; and abasions over the knuckles of the right hand. The fourth finding is consistent with defendant's testimony, but the first three findings are inconsistent with defendant's testimony and permit the logical inference that prior to the shooting defendant struck Hales.

Considered in the light most favorable to the State and after considering defendant's evidence consistent with that of the State, we hold that there was evidence leading to a reasonable conclusion that defendant held Hales at gunpoint outside the trailer, forced the victim into the trailer at gunpoint, and that Hales was shot while defending himself from an attack by defendant. These facts establish substantial evidence of every element of second degree murder. Accepting defendant's version that Hales initiated the circumstances leading to his death when he deliberately threw a coffeepot into defendant's windshield, and recognizing that the law in this state permits one to defend his property with reasonable force, nevertheless, absent use of felonious force by the aggressor, an individual may not endanger life or inflict serious bodily harm. *State v. McCombs*, 297 N.C. 151, 253 S.E. 2d 906 (1979).

[2]  Defendant argues that the evidence, as a matter of law, constituted perfect self-defense. Perfect self-defense requires that:

(1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

(2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

(3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

(4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm. . . .

*State v. Norris*, 303 N.C. 526, 279 S.E. 2d 570 (1981). Taking defendant's version of the incidents as true, he was not entitled to claim this absolute defense. He testified that Hales, after demanding that defendant leave the premises, returned to the office. Defendant intentionally followed Hales into the trailer with a gun knowing the volatile circumstances. Under these facts defendant "aggressively and willingly entered into the fight." *Id.*

Defendant was entitled to, and the trial court instructed the jury on, imperfect self-defense which reduces criminal responsibility to voluntary manslaughter. Imperfect self-defense arises where the first two elements of perfect-defense have been met, but either three or four has not been met. *State v. Norris, supra.* We considered, and the most salient question, was whether the trial court erred in not granting defendant's motion to dismiss the second degree murder charge and instruct only on involuntary manslaughter. The trial court did not so err because, as discussed above, the State presented substantial evidence of second degree murder even though the defendant introduced ample evidence from which the jury may have convicted on the lesser charge.

We hold that the State having proffered sufficient evidence of second degree murder, it was for the jury to resolve the contradictions and discrepancies. *State v. Lowery, supra.*

No error.

Judges ARNOLD and HILL concur.